UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| In re: | |
|---|---|
| Jesse Forrest Poe | Case No. 21-10048-KHK |
| Debtor | (Chapter 7) |
| Industrial Development Authority of the Town of Front Royal and the County of Warren, Virginia A/K/A Economic Development Authority of the Town of Front Royal and County of Warren, Virginia<br><br>Plaintiff<br><br>v.<br><br>Jesse Forrest Poe<br><br>Defendant | AP No. 21-01032-KHK |

## MEMORANDUM OPINION

This matter commenced when the Industrial Development Authority of the Town of Front Royal and the County of Warren, Virginia a/k/a Economic Development Authority of the Town of Front Royal and the County of Warren, Virginia (the "EDA" or the "Agency") filed a complaint (as amended) against the debtor, Jesse Forrest Poe, (the "Debtor") seeking a judgment on behalf of the EDA in the amount of $285,000 in damages. The Amended Complaint[1] also seeks a finding that any amounts owed are nondischargable under 11 U.S.C §§ 523 (a)(2)(A), 523 (a)(4) and 523(a)(6).

The EDA is a small public agency formed by Warren County and the Town of Front Royal to attract new business to their communities. The Agency alleges that the Defendant engaged in a

---

[1] Doc. No. 62, Exhibit C.

1

scheme with Jennifer McDonald ("McDonald") former executive director of the EDA, to convert the property of the Agency to Poe's use without the consent of McDonald's employer.

The Court conducted a trial on April 17, 2023. The following constitutes the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure Fed. R. Bankr. P. 7052.

## Jurisdiction and Venue

The Court has subject matter jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. The counts set forth in the Complaint seeking a determination of the dischargeability of debts constitute core proceedings under 28 U.S.C. § 157(b)(2)(I).

## Findings of Fact

Jennifer McDonald served as the executive director of the EDA from 2008 until 2018.[2] Daniel Whitten served as the assistant attorney for Warren County between 2010 and 2016 and was the County attorney and the EDA's attorney from 2016 to 2019.[3] He attended all EDA board meetings during those periods.[4] At the trial, he explained how the EDA was structured and how it managed the funds at its disposal. He testified the EDA was controlled by Virginia statute, the Agency bylaws and a written Financial Management Policy.[5] He also testified that the bylaws and

---

[2] Doc No. 81 ("Transcript") 80:23-25.
[3] Transcript 154:5-8.
[4] Transcript 154:12-13.
[5] Transcript 154:14-19; 155:2-8.

the Financial Management Policy dictated that capital expenditures exceeding $50,000 required approval by a majority vote of the seven-member board of directors in open board meetings.[6]

Jesse Poe met Jennifer McDonald in 2010.[7] McDonald was the aunt of Poe's high school girlfriend, Morgan Butler.[8] Poe and Ms. Butler socialized with McDonald frequently.[9] The couple house sat for her from time to time and had dinners with McDonald in her home.[10] Poe knew McDonald had a good job and that she was trusted in her community.[11] He believed she was wealthy and experienced in real estate transactions.[12] She previously prepared his tax returns and had access to his checking account information.[13] Poe came to trust McDonald.[14] At trial Poe testified, "She was always around. She was like family."[15]

At age 17, Poe was convicted of vandalism as a juvenile and was ordered to perform 500 hours of community service.[16] McDonald arranged for him to perform much of his community service working for the EDA doing odd jobs on properties owned by the Agency.[17] Those jobs included weed eating, cutting grass, removing barbed wire, and picking up trash, chores which a 17-year-old could do.[18] After graduating from high school, Poe and his stepfather rented a townhouse from McDonald for $800 a month for five years.[19] In addition to his community service, Poe also performed odd jobs for McDonald on other properties for which he was paid in

---

[6] Transcript 155:18-25; 156:1-6.
[7] Transcript 91:7-9.
[8] Transcript 91:5-6; 91:15-19.
[9] Transcript 91:13-25; 92:1-16.
[10] *Id.*
[11] Transcript 193:23-25; 194:1-2.
[12] Transcript 137:2-7; *see* Transcript 208:21-23.
[13] Transcript 122:1-3.
[14] Transcript 127:8-9.
[15] Transcript 91:14.
[16] Transcript 182:9-18.
[17] Transcript 183:3-22.
[18] *Id.*
[19] Transcript 217:16-25; 218:1-6.

cash or by check, and occasionally, McDonald would apply his pay for services rendered to the rent that was due on the townhouse he rented from her.[20]

Sometime during the summer of 2015 Poe told McDonald that he would like to own his own home someday.[21] Knowing she was a real estate agent, he asked her to keep an eye out for a property that he could afford.[22] Around the same time, unbeknownst to Poe, Everett B. Loughry and Linda C. Loughry entered into a residential sales contract for the purchase of property identified as 118 Jutland Court in Stephens City, Virginia.[23] Although the contract purports to bear the signature of Jesse Poe, he denies having entered the contract or signing the document, and his signature on this contract appears visibly different from his signatures on other documents presented at trial that he admitted signing.

Sometime thereafter, Jennifer McDonald arranged the electronic transfer of $285,000 of Agency money into an EDA account at United Bank. A few days later, a cashier's check was issued from that EDA account and was delivered to Service Title of Front Royal, LLC for the purchase of the Jutland Court property.[24] Mr. Whitten testified that a proposal to purchase the Jutland Court property was never brought before the board of directors and the board never voted to approve the purchase of the property in accordance with its normal business operations.[25]

In furtherance of his desire to someday buy a home, Poe testified that he attended a meeting with McDonald at the Service Title office.[26] When asked what he was told about the purpose of the meeting Poe stated, "Jennifer told me before we walked in that I would just have to walk in,

---

[20] Transcript 94:1-8.
[21] Transcript 207:1-2.
[22] *Id*.
[23] Doc. No. 75-1, pg. 1 (Exhibit A).
[24] Doc. No. 75-1, pg. 25 (Exhibit B).
[25] Transcript 156:7-25; 157:1-5.
[26] Transcript 105:2-11.

4

sign here, sign here, sign here, and I will be done."[27] He thought he was signing a credit check application.[28] Prior to this meeting, he had not signed documents engaging McDonald as his real estate agent, nor had he identified a property he wanted to buy. He believed he was signing documents ostensibly to begin the process of qualifying for a zero percent home loan as a first-time buyer.[29] He did not think he was borrowing money to purchase a specific property.[30] He made no attempt to read the documents he signed. He simply trusted McDonald to guide him through the process of ultimately buying a home and blindly followed her instructions when she indicated where he should endorse the documents she placed before him.[31]

Poe did not know the meeting was actually the closing on the sale of the Jutland Court property or that the house was being conveyed to him. He did not know that EDA money was used to purchase the property.[32] Poe never received copies of the settlement documents and never moved into the house or received any mail at that residence.[33] He did not receive a check that was made payable to him for $2,475.60 at the closing or anytime thereafter.[34] Prior to the closing, his only experience with borrowing money was limited to the purchase of a truck for $6,500. In his own words, "I walked into the dealership, I signed some papers, and I had a loan."[35]

In the Fall of 2015, Poe was also employed by B&B Signal Company, LLC as a shop hand.[36] When he was told the company might be moving its headquarters to Richmond, Virginia, and that if he wanted to keep his job he might have to move too, Poe gave McDonald, his landlord,

---

[27] Transcript 105:12-14.
[28] Transcript 190:14-17; 104:5-6.
[29] Transcript 193:15-20.
[30] Transcript 104:2.
[31] Transcript 102: 8-25; 103:1-25.
[32] Transcript 100:5-7.
[33] Transcript 209:20-22.
[34] Transcript 98:9-25.
[35] Transcript 194:8-12.
[36] Transcript 186:9-13.

5

notice that he might be moving.[37] He also told her there was no longer a need to search for a property he might buy. Upon hearing this, McDonald told Poe he already owned a home – that she had purchased a house for him.[38] He was surprised to learn that the property was titled in his name and dismayed because he knew he could not afford to pay for a house and rent a place in a new location.[39] He told McDonald he wanted to sell the Jutland Court property and asked her for advice on how to "get rid of it."[40] She assured him that it would be easy to sell the house and that she would help him do so.[41] She explained that when the property was sold, the proceeds of sale would have to go into his checking account and that she would give him instructions on how to repay the unnamed parties who had loaned him the money to purchase the property.[42] Poe maintained McDonald made all the arrangements for the sale. He admitted signing the residential sales contract as well as the settlement documents at the closing without reading or reviewing them. The ALTA Settlement Statement he signed indicates the entities listed below were paid directly from the sale proceeds:

| | |
|---|---|
| Little Rugratz Daycare | $38,400.00 |
| E.D.A. | $38,400.00 |
| F&M Bank | $26,524.00 |
| Jack Evans, Chevrolet | $11,954.69 |
| Wells Fargo | $ 5,405.20[43] |

Poe admitted receiving a check for the balance of the sale proceeds in the amount of $131,640.44 at settlement and that he deposited that check into his Wells Fargo personal checking account.[44] At McDonald's direction, to pay off the entities who had loaned him the money to buy

---

[37] Transcript 187:6-19.
[38] Transcript 187:18-20.
[39] Transcript 188:13-16; 204:8-9.
[40] Transcript 188:13-16.
[41] Transcript 188:18-20.
[42] Transcript 121:4-18.
[43] Doc. No. 76-2, pgs. 95-96.
[44] Transcript 122:21-24; 132:1-10.

the house originally, Poe wrote a check made payable to Little Rugratz Daycare for $6,500 and a check to McDonald in the amount of $868.00.[45] Under her instruction, he also wrote 15 additional checks made payable to McDonald for $5,000 each. On check numbers 105 and 106, Poe wrote on the memo line that the payments were for rent, even though he knew this was false because he paid his rent to McDonald in cash.[46] He testified that McDonald told him it didn't matter if the information on the memo line was correct because it was not important.[47] He also admitted writing check numbers 107 through 120 made payable to McDonald but denied filling in the memo lines with any information.[48] The memo lines on all but two of the checks in this series were filled in with information indicating the checks were for rent payments.

Poe's checking statements also show the online transactions listed below:

| Date | Description | Amount |
|---|---|---|
| 2/8/ | Chase Epay for George C. Hassenplug | $ 2,000.00 |
| 2/8 | Bank of America for Samuel North | $ 3,000.00 |
| 2/2 | Salliemaebank for Jennifer McDonald | $ 1,003.87 |
| 2/2 | Salliemaebank for Jennifer McDonald | $ 4,663.52 |
| 2/2 | Great Lakes Student Loan for Hayley North | $ 7,127.04 |
| 2/2 | Great Lakes Student Loan for Hayley North | $11,394.60 |
| 2/2 | Bank of America for Samuel North | $ 9,000.00[49] |

Samuel North is the spouse of Jennifer McDonald and Hayley is his daughter.[50] It is unclear from the record whether George C. Hassenplug is the spouse of Linda Hassenplug, McDonald's mother. Poe denied authorizing any of the transactions listed above.[51]

**Conclusions of Law**

---

[45] Transcript 140:8-25; 146:11-25; 147:1-25; Doc. No. 76-1, pg. 75.
[46] Doc. No. 76-1, pgs. 68-69; Transcript 211:12-18.
[47] Transcript 212:1-8.
[48] Transcript 146:11-25; 147:1.
[49] Doc. No. 76-1, pgs. 50-52.
[50] Transcript 192:1-3.
[51] Transcript 191-192.

7

The Complaint in this case contains three counts. Count I alleges that the debt owed to the Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(4) because the Debtor conspired with Jennifer McDonald to steal $285,000 from the EDA with specific intent to deprive the Agency of the use and benefit of the money to its detriment.  Count II alleges that the debt is non-dischargeable under § 523(a)(6) because Poe's exercise of dominion and control of EDA money was a deliberate act by the Debtor with either actual knowledge or the foreseeability that injury would result from his conduct.  Count III alleges non-dischargeability under § 523(a)(2)(A) because McDonald, the Debtor's agent made a representation that was false when made with the intention to deceive, and that the EDA's reliance on the representation caused it to sustain the loss of the funds.  For the reasons that follow this Court finds the Plaintiff has failed to meet its burden of proving by a preponderance of the evidence that the debt to the EDA is non-dischargeable as to Jesse Poe.

Count I – Larceny under 11 U.S.C § 523(a)(4)

Section 523(a)(4) excepts from the Debtor's discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  In this case, Plaintiff has only made allegations to support a finding of larceny, so the court will not address embezzlement or defalcation by a fiduciary.  Larceny is the "fraudulent or wrongful taking and carrying away of the property to the taker's use without the consent of the owner." *In re Davis*, 262 B.R. 663, 672 (Bankr. E.D. Va. 2001) (citing 4 Collier on Bankruptcy at ¶ 23.10[2]). To prevail on a claim of larceny, Plaintiff must prove that felonious intent existed at the time of the taking. Id. at 671 (citing *Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 73–74 (Bankr. S.D.N.Y. 1993), aff'd, 152 F.3d 919 (2d Cir.1998)); *Werner v. Hofmann (In re Hofmann)*, 144 B.R. 459, 464 (Bankr. D. N.D. 1992), aff'd, 5 F.3d 1170 (8th Cir.1993)).

8

Judge St. John in *In re Hathaway*, 364 B.R. 220, 233 (Bankr. E.D. Va. 2007), summarized the criteria necessary to show an intent to deceive as follows:

> Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Universal Bank, N.A. v. Grause (In re Grause)*, 245 B.R. 95, 99 (8th Cir. BAP 2000) (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987)); see also *Marunaka Dainichi Co. v. Yamada (In re Yamada)*, 197 B.R. 37, 40 (Bankr. E.D. Va. 1996); *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 465 (Bankr.E.D.Va.1992). "An intent to deceive may be inferred from a false representation which the debtor should have known would induce a creditor." *Parker v. Grant (In re Grant)*, 237 B.R. 97, 115 (Bankr.E.D.Va.1999) (quoting *Bebber v. J.M. Westall & Co. (In re Bebber)*, 192 B.R. 120, 124 (M.D.N.C.1995)).

*In re Hathaway*, 364 B.R. 220, 235 (Bankr. E.D. Va. 2007).

At trial, Dan Whitten testified that capital expenditures of amounts greater than $50,000 required the approval of the board of directors and that McDonald was not authorized to purchase property with a value of $285,000 because board approval of the acquisition was neither sought nor granted. Here, McDonald's fraudulent intent at the time of the taking may be inferred by the facts and circumstances in this case. When asked under direct examination whether she directed payment of $285,000 from the EDA to Service Title to purchase property without board approval, McDonald invoked her Fifth Amendment privilege not to answer the question. In fact, but for her admission that she served as the executive director of the Agency for several years, she refused to answer any questions at trial about her actions. Her silence along with documentary evidence supporting the allegations that she converted the funds for her personal benefit leads the Court to conclude that she intended to permanently deprive the Agency of the funds.

Although McDonald's actions may constitute larceny under Virginia law and federal common law, whether her conduct may be attributed to Mr. Poe without establishing Poe's knowledge of the scheme or an agency relationship between the two sufficient to hold Mr. Poe

9

liable under Virginia law is a different matter. Again, the Court reiterates that section 523 does not define the scope of persons liable for fraud, that is the purview of state law. Here, the parties seem to agree that Virginia law requires knowledge on the part of the Debtor or an agency relationship between the Debtor and Ms. McDonald in order to impose liability on the Debtor. The parties however disagree that an agency relationship was formed. To start, there is no evidence before the Court that shows Poe ever intended to convert EDA money for his benefit. The Plaintiff simply urges the Court to infer his intent from the circumstances surrounding his conduct. The Court finds nothing in the Debtor's conduct that would lead to the conclusion that he knew McDonald had used EDA funds to purchase the property at the closing that took place in the Service Title office. First, he did not know he was attending a closing. Next, although he showed extreme recklessness by signing the settlement documents without reading them, even if he had done so, he would not have been able to discern where the money to purchase the property came from. The HUD-1 does not specify the source of the funds. Moreover, the Debtor denies that he intended to steal from the Plaintiff, or anyone else. In fact, when he sold the house, the evidence shows that he intended to pay the parties that he was told financed the purchase. The Court cannot conclude based on the facts before it that Poe maintained the requisite intent to convert the Plaintiff's property.

      The Plaintiff also argues that the actions of McDonald must be imputed to the debtor based on an agency relationship that existed between McDonald and Poe. The Supreme Court in *Bartenwerfer v. Buckley*, 214 L. Ed. 2d 434, 143 S. Ct. 665 (2023) recently examined the agency issue we face in this case. In *Bartenwerfer*, before marrying, the debtors formed a business partnership to purchase a house with the goal of remodeling and selling it for a profit. The wife was not involved in the renovation and was unaware of defects in the house. The Court ruled debt

10

that arose from sale proceeds obtained by the debtor-husband's fraudulent misrepresentations in selling the property was obtained by fraud within the meaning of the discharge exception, and so the debtor-wife was precluded from discharging her liability for it, regardless of personal culpability.  Writing for a unanimous court, Justice Barrett acknowledged that in earlier bankruptcy statutes the discharge exception for fraud read "[N]o debt created by the fraud or embezzlement "of the bankrupt" … shall be discharged under this act" Act of Mar.2, 1867, § 33, 14 Stat.533 (emphasis added)."  However, she noted that later statutes deleted "of the bankrupt" from the discharge exception for fraud, which is the predecessor to the modern Section 523(a)(2)(A).  Act of July1, 1898, § 17, 30 Stat.550.  She wrote:

> [I]n the fraud-discharge exception, context does not single out the wrongdoer as the relevant actor. Quite the opposite: The relevant legal context—the common law of fraud—has long maintained that fraud liability is not limited to the wrongdoer. *Field v. Mans*, 516 U.S. 59, 70–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (interpreting § 523(a)(2)(A) with reference to the common law of fraud). For instance, courts have traditionally held principals liable for the frauds of their agents. *McCord v. Western Union Telegraph Co.*, 39 Minn. 181, 185, 39 N.W. 315, 317 (1888); *Tome v. Parkersburg Branch R. Co.*, 39 Md. 36, 70–71 (1873); *White v. Sawyer*, 82 Mass. 586, 589 (1860); J. Story, Commentaries on the Law of Agency 465–467 (1839). They have also held individuals liable for the frauds committed by their partners within the scope of the partnership. *Tucker v. Cole*, 54 Wis. 539, 540–541, 11 N.W. 703, 703–704 (1882); Alexander v. State, 56 Ga. 478, 491–493 (1876); *Chester v. Dickerson*, 54 N.Y. 1, 11 (1873); J. Story, Commentaries on the Law of Partnership 161, 257–259 (1841). Understanding § 523(a)(2)(A) to reflect the passive voice's usual "agnosticism" is thus consistent with the age-old rule that individual debtors can be liable for fraudulent schemes they did not devise.

*Bartenwerfer v. Buckley*, 214 L. Ed. 2d 434, 143 S. Ct. 665, 672–73 (2023).  Like Section 523(a)(2)(A), 523(a)(4) does not refer to debts "of the bankrupt."  Thus, following the Supreme Court's analysis of the statutory construction of 523(a)(2)(A) leads this Court to conclude that the fraud exception under 523(a)(4) is not limited to debts obtained by a debtor's conduct.

11

In the concurring opinion Justices Sotomayor and Jackson point out that the *Bartenwerfer* holding "does not confront a situation involving fraud by a person bearing no agency or partnership relationship to the debtor. Instead, "[t]he relevant legal context" concerns fraud only by "agents" and "partners within the scope of the partnership." *Bartenwerfer v. Buckley*, 214 L. Ed. 2d 434, 143 S. Ct. 665, 677 (2023). Indeed, in pointing out the limited scope of the majority opinion, the concurrence envisions the very fact pattern before this Court. Further, *Bartenwerfer* makes clear that section 523 does not define the scope of persons liable for any underlying fraud, that is the function of state law, here Virginia law.

In this case, the EDA argues that McDonald's wrongful taking of Agency funds may be imputed to the Debtor because McDonald was acting as Poe's agent when she took the money and used the funds to purchase property in his name. The Plaintiff urges this Court to follow the holding in *Bartenwerfer* and find the debt owed to the Agency non-dischargeable as to Poe under Section 523(a)(4); however, the Court declines to do so because the *Bartenwerfer* case differ in one significant aspect from the facts in the instant case—the state law at issue was responsible for imposing fraud liability on the wife. The debtor-wife in Bartenwerfer admitted having a business partnership with the debtor-husband that existed before the fraud occurred and through operation of California law, the fraud was imputed to the wife. That is not the case in the matter before this Court. Throughout this proceeding Poe has maintained that he and McDonald were not partners when the theft occurred and that he did not assent to her act of conversion. He admits asking her to be on the lookout for a property he could afford to buy, however, he never formally engaged her as his agent. Because of his close relationship with her through her niece, he did not think twice about trusting McDonald. He admits he blindly signed documents at her direction that resulted in the purchase of the property but steadfastly maintains he did not read the documents and would

12

not have understood their significance if he had done so. While Poe admits that he engaged McDonald to help him sell the property once he knew it was his, he credibly testified that he believed the money used to purchase the property would be repaid to the unknown lenders who provided the funds for the original purchase. In short, he neither knew that the property was purchased with Agency funds, nor did he conspire to deprive the Agency of those funds. Indeed, rather than being in cahoots with McDonald, the weight of the evidence tends to show that Poe was merely a pawn in the scheme to deprive the EDA of $285,000. McDonald did not disclose to Poe that he owned the property until circumstances forced her to do so. While he failed to exercise due diligence once he learned that the home had been purchased in his name, his actions did not create an agency relationship with McDonald sufficient to impute her felonious conduct to him. The Plaintiff, having failed to prove by a preponderance of the evidence that an agency relationship existed between McDonald and Poe, the debt to the EDA is dischargeable as to the debtor under 523(a)(4) and therefore, Count I will be dismissed.

Count II – Willful and Malicious Injury under 11 U.S.C § 523(a)(6)

Section 523(a)(6) excepts from discharge debts for "willful and malicious injury *by the debtor* to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (emphasis added.) In *K&M Elec. Serv. v. Vito*, Judge Michelle Harner summarized the criteria necessary to except a debt from discharge in the 4th Circuit under this provision.

> Courts interpret the terms "willful" and "malicious" as modifying the term "injury" in section 523(a)(6), thus, requiring an intentional injury and not simply an intentional act. See, e.g., *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *Duncan v. Duncan (In re Duncan)*, 448 F.3d 725, 729–30 (4th Cir. 2006); *Ocean Equity Group, Inc. v. Wooten (In re Wooten)*, 423 B.R. 108, 128–29 (Bankr. E.D. Va. 2010). Courts do not, however, equate "malicious" with malice or ill will. See, e.g., *Craig v. Corbin*, No. GJH-15-2656, 2016 WL 4082620, at *9 (D. Md. July 7, 2016). Rather, courts generally have determined that a "deliberate or intentional" injury that is "wrongful and without

13

cause or excuse" satisfies the willful and malicious standard set forth in section 523(a)(6). See, e.g., *First Nat'l Bank of Maryland v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir. 1995); *Wooten*, 423 B.R. at 128–129; *BB & T Co. of Virginia v. Powers (In re Powers)*, 227 B.R. 73, 76 (Bankr. E.D. Va. 1998).

*K&M Elec. Serv. v. Vito (In re Vito)*, 598 B.R. 809, 825-26 (Bankr. D.Md. 2019). Unlike Section 523(a)(4), Section 523(a)(6) requires the debtor to intend the injury that ultimately results in a loss. In this case, Poe credibly testified he never intended to purchase the Jutland Court property, and he did not know that the money used to purchase the property belonged to the EDA until years after the property was sold. The Court finds that, because Poe did not know where the funds came from, he could not have formed the requisite intent to harm the Agency. Since the Plaintiff has failed to meet its burden of proving that the debtor intended to injure the EDA, the debt is dischargeable under Section 523(a)(6) and Count II of the complaint is dismissed.

Count III – Fraudulent Representation under 11 U.S.C § 523(a)(2)(A)

To establish that a claim is non-dischargeable under §523(a)(2)(A), a plaintiff must prove five elements by a preponderance of the evidence: (1) that a representation was made; (2) at the time the representation was made, the person making such representation knew the representation was false; (3) the representation was made with the intention of deceiving the creditor; (4) the creditor relied on such representation; and (5) the creditor sustained the alleged loss and damage as the proximate result of the false representation. *Com. Cash Flow, L.L.C. v Matkins (In re Matkins)*, 605 B.R. 62, 87 (Bankr. E.D. Va. 2019) (quoting McCoy v. McCoy (In re McCoy), Adv. No. 15-07042-SCS, 2016 WL 4268702, at *9 (Bankr. E.D. Va. Aug. 11, 2016)).[52] Plaintiff must prove each element of section 523(a)(2)(A). *In re Romano*, No. 18-35464-KRH, 2019 WL 5204455, at *4 (Bankr. E.D. Va. Oct. 15, 2019). A misrepresentation occurs when funds are

---

[52] The Court notes that the standard cited from these authorities has since been modified by *Bartenwerfer*, and as a result, the misrepresentation at issue need not be one made by the debtor.

entrusted to a debtor for a specific purpose, and the debtor has no intention of using the money for that purpose. *In re Dunlap*, 458 B.R. 301, 332 (Bankr. E.D. Va. 2011). Fraud and misrepresentation may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor." *In re Hathaway*, 364 B.R. 220, 233 (Bankr. E.D. Va. 2007). A misrepresentation regarding a material fact may be implied from one's silence. *In re Kahler*, 187 B.R. 508, 512 (Bankr. E.D. Va.1995) (citing *In re Bozzano*, 173 B.R. at 993). *In re McKnew*, 270 B.R. 593, 618 (Bankr. E.D. Va. 2001).

The Complaint does not include a specific representation made by Poe or McDonald. Instead, the Plaintiff urges the Court to infer that McDonald intentionally did not disclose the purchase of the property to the Agency or that the purchase was for her benefit. By her silence, the Court infers McDonald knew she was using EDA funds for an improper purpose, namely for her personal benefit, and without her employer's consent. Her failure to disclose her actions to the Agency amounts to a misrepresentation or representation by omission. Therefore, the Court concludes that the first and second elements necessary to prove non-dischargability under §523(a)(2)(A) are satisfied.

As previously discussed, the Court finds the Plaintiff has sustained its burden of proving McDonald intended to deceive the EDA. Logic would dictate that she knew the Agency was relying on her to exercise her authority appropriately and that the Agency trusted her to use the proper procedures to obtain authority to purchase real property for the benefit of the organization. She also knew the EDA was trusting her to manage its financial affairs without daily oversight or supervision. Thus, it can be inferred that McDonald knew that the Agency would not discover her financial indiscretions unless she specifically brought the transactions to its attention. Therefore, the Court concludes that McDonald possessed the requisite intent to deceive the EDA when she

used Agency funds to purchase property in the name of Jesse Poe for personal use, and therefore the third element necessary to prove non-dischargeablilty under Section 523(a)(2)(A) is satisfied.

The fourth element requires the EDA to prove that it relied on McDonald's representations. The Supreme Court has ruled that a plaintiff must prove that he justifiably relied on the debtor's representations in order to succeed under Section 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 73-74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). It held "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. at 71. Justifiable reliance does not require that the EDA continually look over McDonald's shoulder. In fact, to require such vigilance would defeat the Agency's goal in hiring an executive director in the first place. According to Mr. Whitten, no circumstances arose that would have triggered suspicion in the EDA as to a possible misrepresentation by McDonald until after the company had suffered severe harm at her hands. Therefore, the Court finds that the fourth element of non-dischargeability has been met in this case.

The final element that the EDA must prove is whether damages were a proximate result of McDonald's misrepresentations. Proximate cause is both (1) causation in fact, and (2) legal causation. In re McKnew 270 B.R. at 622. There is no dispute that the EDA has suffered harm in this instance. The Exhibits clearly show that $285,000 of Agency funds were used to purchase property for the benefit of McDonald and Poe. The remaining question then, is whether the EDA suffered damages that were legally caused by the Agency's reliance on McDonald's misrepresentations. In this case there is a direct correlation between the misrepresentation of McDonald and the damages suffered by the EDA. In other words, but for the misrepresentation by McDonald's unauthorized personal use of Agency funds, the EDA would not have suffered a

16

loss. Therefore, the Court finds that the Plaintiff has satisfied its requirement to prove the fifth element of non-dischargeability under Section 523(a)(2)(A).

Even though the Plaintiff has proven each of the elements of non-dischargability required under 523(a)(2)(A), the Court cannot find that the actions of McDonald may be imputed to the Debtor in this case. The Plaintiff urges the Court to assume Poe knew he was buying the property and that he was doing so with funds that did not belong to him. The Court is not convinced that this is so. Rather, the Court is persuaded by Poe's testimony that he was not aware that he was purchasing the property at the first closing, and he certainly was not aware that the purchase was being paid for with stolen funds. Nor is the Court convinced that Poe was acting in concert with McDonald to convert EDA funds. It is clear from his testimony that Poe was surprised, and more to the point, worried and upset when he was told he owned the property because he knew he could not afford to pay for it while renting a property in another city. When faced with the knowledge of ownership, his only objective was to get rid of the house. He did not know how to make that happen, so he put his trust in McDonald to get it done and she did in short order. Poe signed the documents required to sell the property without reading them, as was his habit. The mere fact that he received so little of the profit from the sale of the house tends to show he had no idea of the financial ramifications of the first or second sale of the property. Ultimately, he demonstrated extremely bad judgment, but this alone is insufficient to hold him responsible for the actions of McDonald. Because the Plaintiff has failed to prove by a preponderance of the evidence that an agency relationship existed between McDonald and Poe, the Court concludes that the debt to the EDA is discharged under Section 523 (a)(2)(A) of the Bankruptcy Code. Therefore, Count III of the Complaint must also be dismissed.

The Court will issue a separate order consistent with these findings and conclusions.

Date: Jul 3 2023

/s/ Klinette H Kindred

Klinette H. Kindred
United States Bankruptcy Judge

Entered On Docket: Jul 5 2023

Mailed copies to:

Jesse Forrest Poe
4195 Narrows Lane
The Plains, VA 20198-2136
*Debtor*

Electronic copies to:

C. Thomas Ebel
Klementina Vasileva Pavlov
Cullen Dennis Seltzer
*Plaintiff's Counsel*

William E. Shmidheiser, III
*Debtor/Defendant's Counsel*